* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford, and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are subject to the N.C. Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. The carrier liable on the risk is The Schafter Companies.
4. The parties agree that plaintiff is entitled to the maximum compensation rate in effect for 2002.
5. The issues before the Full Commission are whether plaintiff's employment with defendant-employer placed him at an increased risk of developing job stress which exacerbated or aggravated pre-existing post-traumatic stress syndrome, depression, and/or bipolar disorder; whether the doctrine of quasi estoppel applies to prohibit plaintiff from asserting a claim for PTSD caused or significantly contributed to by his employment with defendant-employer; and whether plaintiff's claim is time barred under N.C. Gen. Stat. § 97-58.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the Deputy Commissioner's hearing, plaintiff was 58 years of age and has a third grade education. Plaintiff enlisted in the United States Marine Corps at age 19 and served in Vietnam. Plaintiff was shot in the left arm and was medically discharged from military service, with a 60% disability rating to his left arm. Plaintiff's Veterans Affairs records reflect that he was subsequently diagnosed with post-traumatic stress disorder (PTSD) and, as of December 14, 1999, had been assessed as 50% disabled due to his PTSD. *Page 3 
2. Plaintiff began employment with Federal Paper in 1979. In approximately 1996, defendant-employer purchased the plant from Federal Paper. Through the years, plaintiff worked as a lancer, helper, fireman, assistant operator, evaporator operator, and recovery operator.
3. In his last seven years with defendant-employer, plaintiff worked as a recovery operator and was responsible for the operation of three recovery boilers and two evaporators. The recovery boilers purify spent or black liquor, thereby recovering green liquor for reuse in the production of paper products. Boiler operators often worked overtime since there were only six people qualified to work as the recovery operator and an operator was required to be on site at all times.
4. The recovery operator must maintain the boiler operation in a safe and efficient manner, utilizing several gauges and monitors to ensure that the equipment is operating properly. The operator is also responsible for directing the fireman regarding what activities need to be performed to ensure that the machinery is operated properly and safely, and that the boilers do not explode. A recovery boiler exploded in 1984 or 1985, but there were no deaths from that explosion. In 1997, a boiler exploded in the power department, resulting in the death of one employee and serious injury to another.
5. After taking over management of the plant from Federal Paper, defendant-employer made some changes in operations, including bringing in new supervisors and implementing new safety practices. Plaintiff became frustrated and angry about the new company policies and what he perceived to be blatant disregard for safety.
6. On July 3 and August 4, 2000, plaintiff treated with Dr. Henry Branham, a psychiatrist. Plaintiff informed Dr. Branham that he was having a lot of stress on his job because *Page 4 
he had a lot of responsibility but no authority. Dr. Branham diagnosed plaintiff with PTSD related to his Vietnam experiences.
7. Also in August 2000, a fire occurred while plaintiff was on duty. Assistant superintendent Dave Anderson issued plaintiff a written warning for failing to respond to several alarms that would have prevented the fire. In response, plaintiff threw his badge down and resigned. Mr. Anderson did not accept plaintiff's resignation, referred him to Susan Roscher, a licensed clinical social worker with defendant-employer's employee assistance program (EAP), and removed the reprimand from plaintiff's file.
8. At his first visit with Ms. Roscher on August 15, 2000, plaintiff reported "considerable job stress." He acknowledged the incident with the fire alarm and also reported his Vietnam history, assessment with PTSD, and his heavy use of alcohol. Plaintiff told Ms. Roscher that he felt that defendant-employer did not listen to him or take safety seriously. Plaintiff was frustrated that defendant-employer put him in a position of responsibility with no authority to make the changes plaintiff believed were needed. Ms. Roscher noted that Mr. Anderson felt that plaintiff was an excellent employee and did not want him to quit working. Ms. Roscher encouraged Mr. Anderson to let plaintiff cool off for a few days and also discussed with him plaintiff's workload.
9. On August 17, 2000, plaintiff told Ms. Roscher that he felt that defendant-employer was not listening to him. Ms. Roscher recommended that plaintiff see Dr. Frank Snyder, an internal medicine physician, for a physical and that plaintiff take some vacation time. During his visits with Ms. Roscher, plaintiff continued to express feelings of anxiety or depression. On August 24, 2000, plaintiff stated that he was "feeling great" but he did not want to go back to work. Plaintiff also told Ms. Roscher that he believed that he drank to cover up *Page 5 
anxiety. On August 31, 2000, plaintiff's wife called Ms. Roscher and expressed concern about her husband's safety, reporting that he was very depressed and she was worried about possible suicide.
10. On September 5, 2000, plaintiff saw Dr. Snyder. Dr. Snyder noted that plaintiff was scattered, not functioning at a high level, drinking too much, and complaining about work.
11. On September 14, 2000, plaintiff related to Ms. Roscher that he had worked all night and was stressed. Plaintiff stopped seeing Ms. Roscher in January 2001, and she referred him to Dr. Paul Buongiorno, a psychiatrist.
12. Plaintiff saw Dr. Buongiorno on January 22, 2001. Plaintiff reported sleep problems for many years, excessive drinking of coffee and alcohol, a 30 pack year smoking history, marital strife, and many physical problems, including hypertension, diabetes, obesity, and three abdominal hernias. Plaintiff also reported that he was previously diagnosed with PTSD related to his military service, although plaintiff did not believe it was an accurate diagnosis. Plaintiff reported struggles with his supervisor and that he quit his job due to a disagreement. Dr. Buongiorno found plaintiff to be "tense, anxious and uncooperative." He noted that plaintiff was "not interested in making any life style changes" such that it would be difficult to develop a treatment plan. Dr. Buongiorno assessed plaintiff with alcohol dependence, caffeine dependence, nicotine dependence, insomnia, hypertension, diabetes, obesity, and deferred some other possible assessments.
13. On May 30, 2001, plaintiff called Dr. Snyder regarding continued depression and Dr. Snyder prescribed plaintiff Celexa, an anti-anxiety medication. In July 2001, Dr. Snyder first diagnosed plaintiff with depression, although Ms. Roscher's records indicate that Dr. Snyder *Page 6 
placed plaintiff on Wellbutrin by January 2001. In August 2001, plaintiff's wife contacted Dr. Snyder to get anti-anxiety medication for plaintiff.
14. Plaintiff continued to work and, on January 26, 2002, he was working on what would have normally been on his day off. When he arrived at work, plaintiff found a discrepancy in the manual test conducted by the fireman, Willie Lowery, which indicated a possible problem with the dissolver. Plaintiff asked Mr. Lowery to repeat the test and called shift foreman Doug Rowe to the control room. Mr. Rowe asked plaintiff about the situation and plaintiff repeated that the remote was not right. If the transmitter plugged up, it would convey inaccurate information, which impacts the levels set by the remote control loop. The transmitter is periodically flushed to avoid plugging and manual checks reveal when a transmitter is plugged. Additionally, if a transmitter is plugged, there are other safeguards to prevent a remote control from reducing weak wash to an unsafe level. Plaintiff initially thought the transmitter was plugged and giving out incorrect information. Mr. Rowe did not understand plaintiff's concern because plaintiff still had one of the two dissolvers set in remote control, as opposed to manual. When Mr. Rowe asked plaintiff to explain his concern, plaintiff left the control room to smoke. Eventually, plaintiff told Mr. Rowe that the instrument man, Harold Tyndall, had flushed the transmitter earlier in the shift. Mr. Tyndall informed Mr. Rowe that plaintiff had recalled him to the control room before he was able to flush the transmitter. This miscommunication resulted in the transmitter not being flushed, which caused a problem. Mr. Rowe had Mr. Tyndall flush the transmitter.
15. Plaintiff then requested relief from his shift and Mr. Rowe tried to secure relief under union rules, but no qualified operator would come in. When Mr. Rowe returned from trying to find another operator, he learned that plaintiff had filed a grievance against him. Mr. *Page 7 
Rowe then called his supervisor and secured a relief operator. He called plaintiff to his office and told plaintiff not to return to work for one day.
16. The next day, plaintiff attended a meeting about the incident. On January 30, 2002, plaintiff called Dr. Snyder complaining of being moody, and Dr. Snyder prescribed Effexor after the phone call. On February 4, 2002, plaintiff was issued a written reprimand for the January 26, 2002 incident.
17. On March 26, 2002, plaintiff returned to Ms. Roscher with complaints of "serious job stress." On April 2, 2002, plaintiff complained to Ms. Roscher that he was not sleeping and was working 16-hour days. On a Duke Employee Assistance Program (EAP) Client Intake and Consent Form for the April 2, 2002 visit, plaintiff reported "job stress" as his only concern.
18. On April 4, 2002, Ms. Roscher completed an assessment of plaintiff, noting that his Vietnam service and PTSD had gone untreated for years. Ms. Roscher noted that plaintiff was anxious all the time, did not sleep, had a history of getting into barroom brawls, and felt harassed at work. She also noted plaintiff's conflicts with family and money problems, stating that plaintiff's wife was a heavy drinker and that he may have reached the bottom with respect to his job. Ms. Roscher assessed plaintiff with alcohol dependence, PTSD, major depression, and general anxiety disorder, identifying stressors in his life as his job, home life, marriage, and money. She recommended plaintiff sober up for two weeks and return for a referral to a psychiatrist.
19. On June 12, 2002, the last day plaintiff worked for defendant-employer, plaintiff came off a 12-hour shift when he spoke to Andy Knoll, an assistant superintendent. Plaintiff told Mr. Knoll that report sheets were not being checked off in the proper manner and that the operators were not writing down the proper temperatures. Mr. Knoll told plaintiff that the other *Page 8 
operators needed to learn the job so they would not be overly reliant on the computer. Plaintiff apologized for bringing up the subject. He then cleaned out his locker and went home, and did not attend a safety meeting. Plaintiff has not returned to work since June 12, 2002.
20. On June 13, 2002, plaintiff returned to Dr. Snyder and reported that he was under stress at work. Dr. Snyder initially believed that plaintiff was on the tail end of a transient ischemic attack (TIA), or mini-stroke. Dr. Snyder ordered an MRI of the brain and of the head, neither of which showed any concerns about the vascular system. Dr. Snyder also took plaintiff out of work for three weeks. At this time, plaintiff also completed an application for disability benefits from CUNA Mutual Society. Plaintiff began to receive benefits of $840.00 per month, with the date of disability beginning June 5, 2002.
21. Also in June 2002, plaintiff returned to Dr. Branham and stated that he was working 12 and 16-hour shifts, not getting enough sleep and felt that his life was being controlled by work. Dr. Branham noted that plaintiff's condition was deteriorating as evidenced by his lower Global Assessment of Function (GAF) test scores. On June 18, 2002, Dr. Branham took plaintiff out of work, stating in a letter that the activities at plaintiff's job were aggravating or exacerbating his previously diagnosed PTSD. By June 18, 2002, the assessment of plaintiff's disability due to PTSD was increased to 70%.
22. At his deposition, Dr. Branham testified that individuals who have PTSD are primed for certain stimuli and that they could possibly respond to situations in an explosive and volatile way. Dr. Branham testified that based on plaintiff's history and job description, the conditions of plaintiff's employment exacerbated or aggravated his preexisting psychiatric condition. *Page 9 
23. In a follow-up note on July 23, 2002, Dr. Snyder wrote that plaintiff was suffering from stress, depression and neurosis. On July 25, 2002, Dr. Snyder diagnosed plaintiff with psychosis and depression, and prescribed plaintiff Remeron and referred him to Dr. Frank Stevens, a psychiatrist.
24. At his deposition, Dr. Snyder testified that plaintiff would be a danger to himself or others at work and that he should not return to work of any kind. Dr. Snyder felt plaintiff's job placed him at an increased risk of developing depression, neurosis and PTSD as opposed to the general public. Dr. Snyder was trained by the Navy in drug abuse counseling and has participated in courses and continuing medical education in that area; however, he is an internal medicine specialist and has no medical training in psychiatry. Thus, the Full Commission gives less weight to his testimony than to plaintiff's treating psychiatrists.
25. Plaintiff filed a Form 18 with defendant-employer on July 23, 2002; however, there is no evidence that this form was filed with the Commission. Plaintiff did file a Form 18 with the Commission on June 8, 2004. Plaintiff initially went out of work due to his psychological condition briefly in August 2000 and permanently on June 13, 2002. Although the record is not clear when plaintiff was first informed by competent medical authority of the nature and work-related cause of his disease, Dr. Snyder took plaintiff out of work on June 13, 2002 due to job-related stress and in a letter dated August 16, 2002, Dr. Branham took plaintiff out of work due to job-induced stress disorder. The identification of job stress and anxiety in 2000 by Ms. Roscher, a social worker, does not constitute notification by "competent medical authority" as required by N.C. Gen. Stat. § 97-58. Therefore, the Full Commission finds that plaintiff timely filed his claim for an occupational disease within two years of disability and notice of the work-related nature of his illness which occurred on June 13, 2002. *Page 10 
26. On August 28, 2002, the Veterans Administration approved unemployability benefits for service-related PTSD for plaintiff based on an increased disability rating of 70%. The award specified that unemployability benefits are awarded where service-connected disability prevents an individual from securing or following a substantially gainful occupation.
27. On October 10, 2003, defendant notified plaintiff that he was approved for disability retirement benefits effective April 1, 2003.
28. On referral from Ms. Roscher, plaintiff went to see Dr. James Pawlowski, a board certified psychiatrist. Dr. Pawlowski examined plaintiff on September 27, 2004 and diagnosed plaintiff with major depressive episode, alcohol dependence, history of PTSD and rule-out bipolar disorder. Initially Dr. Pawlowski felt plaintiff did not meet the criteria for bipolar disorder, but in mid-2005, he did diagnose plaintiff with bipolar disorder. Dr. Pawlowski further explained that certain anti-anxiety medications such as Effexor, Celexa, Wellbutrin and Remeron were more likely to cause irritability and agitation in plaintiff because of his bipolar disorder. Dr. Pawlowski testified that plaintiff's job as a recovery operator placed him at an increased risk of exacerbating his disorders than the general public not so employed. Dr. Pawlowski stated that plaintiff was unable to return to work in any employment.
29. On June 23, 2005, plaintiff saw Dr. Gerald Aronoff, who is board certified in pain medicine, psychiatry and neurology, for an independent medical evaluation. Dr. Aronoff diagnosed plaintiff with major depression, recurrent, mild to moderate without psychotic features. Based on plaintiff's history and an extensive review of his medical records, Dr. Aronoff concluded that plaintiff's long-standing dysfunctional behavior and lifestyle and his lack of motivation to change contributed to plaintiff's personal, marital and work-related problems and that plaintiff's decision to leave work should not be viewed as a work-related activity. He *Page 11 
felt that plaintiff was dissatisfied with his job and that there was no work-related injury, as none of plaintiff's medical records indicate any evidence of a causal relationship between plaintiff's emotional symptoms and his employment with defendant-employer. Dr. Aronoff also found that there was not adequate documentation to diagnose plaintiff with PTSD and that if plaintiff has any psychiatric disability, it is unrelated to his work for defendant-employer. Dr. Aronoff concluded that more likely than not, plaintiff's current condition was not causally related to his employment with defendant-employer and that his work environment would not exacerbate or aggravate his depression. He felt that plaintiff was not disabled from all occupations but should be considered disabled from returning to work with defendant-employer due to residual anger.
30. The Full Commission gives greater weight to the testimony and opinions of Dr. Branham, Dr. Pawlowski, and Dr. Aronoff than those of Dr. Snyder, and finds that plaintiff's job with defendant-employer did not place him at an increased risk for developing PTSD, depression or bipolar disorder.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-58 states in part, "The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same." In this case, plaintiff filed a Form 18 with the Commission on June 8, 2004. Therefore, plaintiff timely filed his claim for an occupational disease within two years of disability and notice by competent medical authority of the work-related nature of his illness which occurred on June 13, 2002. *Page 12 
2. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368, disc. rev. denied, 351 N.C. 473, 543 S.E.2d 488 (2000). Where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition.Futrell v. Resinall Corp., 151 N.C.App. 456, 566 S.E.2d 181 (2002),aff'd per curiam, 357 N.C. 158, 579 S.E.2d 269 (2003); Norris v. DrexelHeritage Furnishings, Inc., 139 N.C.App. 620, 534 S.E.2d 259 (2000),cert. denied, 353 N.C. 378, 547 S.E.2d 15 (2001).
3. In the present case, plaintiff proved by the greater weight of the evidence that his employment caused or was a significant contributing factor in his development of PTSD, but failed to prove that PTSD was characteristic of or peculiar to his employment or that he was at an increased risk of developing this condition due to his work. Hansel v.Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
4. Therefore, plaintiff did not contract a compensable occupational disease within the meaning of the law. N.C. Gen. Stat. § 97-53(13).
5. In addition, the doctrine of quasi estoppel prohibits plaintiff from asserting a claim for PTSD caused or significantly contributed to by his employment with defendant-employer, as plaintiff has obtained military disability benefits by maintaining that he is unemployable due to his service-related PTSD. Godley v. Pitt County, 306 N.C. 357,293 S.E.2d 167 (1982). *Page 13 
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be and is hereby DENIED.
2. Each party shall pay their own costs.
This 20 day of August, 2007.
S/_____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
 S/_____________________ DANNY LEE McDONALD COMMISSIONER *Page 1